### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JIMAIL TAYLOR and KENDRA SMITH,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 3:03CV1665(DJS)** |
| | : | |
| **CITY OF MIDDLETOWN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

### MEMORANDUM OF DECISION

On February 13, 2002, plaintiffs Jimail Taylor and Kendra Smith brought this action for damages against defendants the City of Middletown, Sergeant Sean Moriarty, and Lieutenant Francis Ahlquist of the Middletown Police Department pursuant to 42 U.S.C. § 1983, claiming violations of their rights under the Fourth Amendment of the United States Constitution, and negligence.  Now pending is defendants' motion for summary judgment (dkt. # 32) pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  For the reasons stated herein, this motion is **GRANTED in part** and **DENIED in part**.

### I. FACTS

The factual basis for this lawsuit is the defendants' use of a flash-bang distraction device while executing a search warrant, which caused serious injuries to plaintiffs Taylor and Smith.  On November 21, 2000, Detectives Jorge Yepes and Stephen Augeri of the City of Middletown Police Department ("the Department")

obtained a warrant to search Apartment 3-B at 594 Main Street, Middletown, Connecticut ("Apartment 3-B"). The officers stated, and a judge of the Connecticut Superior Court found, that they had probable cause to believe that a search of Apartment 3-B would reveal evidence of the manufacture, use, and sale of crack cocaine. The affidavit in support of the warrant details information received from three confidential informants, two of whom made controlled purchases of crack cocaine at Apartment 3-B in November of 2000. The court also granted the applicants' request to waive the "knock and announce" requirement for execution of the warrant.

The Department executed the warrant to search Apartment 3-B on November 28, 2000 at 4:00 a.m. The Department S.W.A.T. team opened the front door with the aid of a ram, and defendant Moriarty "deployed a Deftech No. 25 Distraction Device by using a right-handed underhand toss" toward, according to Moriarty, "an empty part of the living room of the apartment." (Dkt. # 33 ¶¶ 8 & 9.) A flash-bang distraction device produces a bright flash and a loud noise for the purpose of disorienting persons within its range in order to provide police entering high risk areas with a tactical advantage. According to Moriarty, he "identified an empty part of the living room of the apartment prior to tossing the device." (Id. ¶ 10.) Moriarty states that, after tossing the device into the apartment, he "observed two

individuals move off the couch and in the direction of the device as it traveled towards the living room[.]" (<u>Id.</u> ¶ 11.)  Moriarty also states that the device "was used for officer safety due to the prior information that hand guns had been observed in the apartment as recently as one hour prior to execution of the warrant[.]" (<u>Id.</u> ¶ 13.)  The police found illegal drugs and drug paraphernalia inside the apartment.

Taylor's recollection of these events is as follows.  When she heard the police at the door, she was seated on a couch located near the door in the apartment with Smith.  Taylor was seated closest to the door.  She heard the police knock on the door softly, and then begin hitting the door.  When Taylor heard the police hit the door, she turned to look at the door, and then she turned to look at Smith.  At that point, Taylor saw "a big loud explosion and a bright pink flash and black smoke." (Dkt. # 36 Ex. D at 87:15-16.)  After that, Taylor heard Smith "screaming that her face was burning." (<u>Id.</u> at 87:18-19.)  Regarding the path of the device, Taylor testified as follows:

> Q.   And did you believe you were struck by whatever
>      was thrown before it exploded?
>
> A.   No.
>
> Q.   Do you know where it landed before it exploded?
>
> A.   No.
>
> Q.   But it certainly didn't land on top of you?
>
> A.   It might have, I don't know.

-3-

> Q.   But you don't have a memory of being hit with
>      something other than the explosion and the flash?
>
> A.   Yes.

(Id. at 88:7-17.)  Taylor sustained laceration and burn injuries to her left thigh and her left forearm.

Smith's recollection of these events is as follows.  While seated with Taylor on a couch near the door, Smith heard a knock on the door, and watched Perris Gilbert, one of the apartment's occupants, go to the door.  Gilbert then went into the apartment's bedroom and said, "It's the police."  After Gilbert went into the bedroom, Smith heard the police knock the door open, and she turned her head towards the door. Smith saw the officer with the ram and then saw "one of the three police officers who was looking directly at me, lob some sort of explosive device into the air toward Jimail Taylor and me." (Dkt. # 51 ¶ 13.)  Upon seeing the device, Smith covered her face with both hands, but did not close her eyes.  Smith states that she saw the device land on top of Taylor's left thigh, which was draped across Smith's lap on the couch.  Smith sustained injuries to her eye, face, and eardrum.

## II. DISCUSSION

Taylor and Smith allege that Moriarty, Ahlquist, and the City of Middletown violated their Fourth and Fourteenth Amendment rights.  Defendants have moved for summary judgment with respect to all counts of the Amended Complaint.  Defendants deny

-4-

liability on all counts, and Moriarty and Ahlquist raise the affirmative defense of qualified immunity for the federal claims asserted against them.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the

-5-

nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

## B. FOURTH AMENDMENT

Taylor and Smith assert that they were subjected to unreasonable force in violation of the Fourth Amendment to the U.S. Constitution.  The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out, whether pursuant to a warrant or under 'exigent circumstances.'"  Ayeni v. Mottola, 35 F.3d 680, 684 (2d Cir. 1994), abrogated on other grounds by Wilson v. Layne, 526 U.S. 603 (1999).

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In Saucier v. Katz, 533 U.S. 194 (2001), the

-6-

Supreme Court established a three-step analysis for determining whether an officer is entitled to qualified immunity. First, the court determines whether the facts, taken in a light most favorable to the party asserting an injury, could show a constitutional violation. See Saucier, 533 U.S. at 201. Second, the court determines "[w]hether the [constitutional] right was clearly established." Saucier, 533 U.S. at 201; Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Third, the court determines the objective reasonableness of the officer's conduct. An officer "will not be immune, if, on an objective basis, it is obvious that no reasonably competent officer would take the actions of the defendant." Malley v. Briggs, 475 U.S. 335, 341 (1986). If, however, "officers of reasonable competence could disagree," then "immunity should be recognized." Id.

    Taylor and Smith allege that defendants' use of a flash-bang distraction device was unreasonable under the circumstances. Because use of the device, which explodes to produce a blinding flash and a loud noise, is an application of force, use of the device must be reasonable. "A free citizen's claim that law enforcement officials used excessive force" is "properly analyzed

under the Fourth Amendment's 'objective reasonableness' standard.
. . ." Graham v. Connor, 490 U.S. 386, 387 (1989).  Under
Graham, "[t]he 'reasonableness' inquiry in an excessive force
case is an objective one: the question is whether the officer's
actions are 'objectively reasonable' in light of the facts and
circumstances confronting them, without regard to their
underlying intent or motivation." Id. at 397.  Courts conducting
this reasonableness inquiry must evaluate the specific facts of
the case, "[i]ncluding the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of
the officers or others, and whether he is actively resisting
arrest or attempting to evade arrest by flight."  Id. at 396.

Here, defendants decided to use the distraction device based
upon the following known facts.  In the fall of 2000, the
Department's Street Crimes Unit learned that two black males, who
might have been Jamaican, had moved into Apartment 3-B and were
selling crack out of Apartment 3-B.  On or about November 4,
2000, a "reliable source" told an officer that, while inside
Apartment 3-B, the source saw many young black and Hispanic men.
The source said that a black man pointed a gun at the source, and
that a Hispanic man also pointed a gun at the source and said
that "they were the 'New Haven boys', and that they were going to
'move' things in the Northend, and that if anyone got in their

-8-

way they would hurt them or even shoot them." (Dkt. # 36 Ex. A ¶ 4.)[1]

After learning this information, the Department set up four controlled purchase of crack. On or about November 13, 2000, the police set up a controlled drug purchase through a confidential informant, CI # 1, who had provided accurate information to the police nine prior times. CI # 1 purchased crack and told the police that a black man had searched CI # 1's person while a Hispanic man had pointed a gun at CI # 1. CI # 1 refused to go to Apartment 3-B on behalf of the police again because CI # 1 was afraid of being hurt. On or about November 20, 2000, another confidential informant, CI # 2, who had provided accurate information on six prior occasions, made two controlled purchases of crack from Apartment 3-B. CI # 2 did not report seeing weapons at apartment 3-B. Also, at an undisclosed time "[p]rior to the execution of the warrant," which apparently was on

---

[1] Plaintiffs argue that the officers' testimony conveying the confidential informants' statements regarding the presence of weapons in Apartment 3-B is inadmissible hearsay. Defendants, however, are not attempting to prove that the occupants of Apartment 3-B had weapons; rather, defendants seek to prove that their decision to use a distraction device was reasonable under the circumstances. Therefore, their testimony conveying the out-of-court statements of the confidential informants would not be admissible to prove that the occupants of Apartment 3-B had weapons, but are admissible to prove that defendants' belief that they needed to use a distraction device when executing the warrant to search Apartment 3-B was reasonable. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

November 27, 2000 or prior to 4:00 a.m. on November 28, 2000,
Detective Augeri arranged for a confidential informant to
purchase drugs, and the CI did return with crack.  The record
does not reflect whether this CI observed weapons at Apartment
3-B.

Based upon the foregoing, the Department deployed a S.W.A.T.
team to execute the search warrant.  According to Moriarty,
"[p]rior to the execution of the search warrant, the S.W.A.T.
Team was provided with information that hand guns were observed
within the apartment as recently as one hour prior to execution
of the warrant."  (Dkt. # 36 Ex. C ¶ 5.)  The warrant applicants
also noted their knowledge that weapons were often present at
locations where drugs were purchased for the protection of the
sellers.  Moriarty also states that, after the door was opened,
he looked inside Apartment 3-B and selected an empty part of the
room toward which to throw the device.

The circumstances leading to plaintiffs' injuries are
somewhat atypical.  Defendants did not employ force as a reaction
to plaintiffs' conduct; indeed, as plaintiffs point out, they
themselves posed no actual or potential threat to defendants-
Taylor and Smith simply were sitting on a couch when the officers
entered.  Nor does this case present the question of whether an
officer was justified in employing a calculated, preemptive
display of force without actually causing physical harm to the

plaintiff.[2]  Rather, this case involves the calculated decision
to use a non-lethal explosive device as a preemptive measure,
which caused actual physical injury to plaintiffs, who were not
suspected of conduct related to the criminal investigation
leading to the issuance of a warrant.

No binding authority dictating a result in this case exists,
but courts from other jurisdictions have addressed similar claims
involving the same kind of distraction device.  In Boyd v. Benton
County, 374 F.3d 773 (9th Cir. 2004), the Court of Appeals
affirmed the district court's finding that the defendant officers
had violated the Fourth Amendment when they used a distraction
device while executing a warrant to search a one-bedroom
apartment, and the device injured a woman sleeping in the
apartment.  In Boyd, the officers had reason to believe that

> an armed robbery suspect . . . was still at large and
> could have been inside the apartment; the .357 magnum
> had yet to be recovered and might have been in the
> possession of someone inside the apartment; they had
> obtained information that another individual connected
> with the apartment had attempted to purchase an "SKS"
> assault rifle; two armed individuals, who attempted to
> evade police, had been seen exiting the apartment a
> short time beforehand; the apartment had a loft from
> which a shooter could have placed the officers in a
> vulnerable position as they entered the apartment; and
> there was a possibility that five to eight people would
> be sleeping inside the apartment.

Id. at 777.  The officers decided, prior to arriving at the

---

[2] Courts have held that this conduct does not even invoke
the protection of the Fourth Amendment.

apartment, to deploy the distraction device near the apartment's front door "because the risk of someone sleeping there was minimal." Id. When executing the warrant, the officers deployed, without warning the occupants or looking inside the apartment, the device as planned, but Boyd was in fact sleeping near where the device detonated and sustained injuries from the device. See id. at 777-78.

The Court of Appeals held that the officers' use of the distraction device under the circumstances was excessive force. Specifically, the court reasoned as follows:

> [h]ere, viewing the facts in the light most favorable to Boyd, the officers' use of force was constitutionally excessive. The officers had information leading them to believe that up to eight people could be sleeping within the apartment. Without considering alternatives such as a controlled evacuation followed by a search, the officers (according to Boyd) deployed the explosive flash-bang device-which the officers knew had the potential to cause injury-in the room without looking or warning the occupants. The officers had reason to believe that the Hispanic suspect and a gun could be in the apartment, and that there was a loft on the premises.
>
> But this cannot have reasonably caused the officers to believe that it was appropriate to toss, without either looking or sounding a warning, an explosive, incendiary weapon into an apartment where it was believed that there were up to eight people, most of whom were unconnected to the robbery and many of whom were likely asleep.

Id. at 779. The Court further concluded that "given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw

it 'blind' into a room occupied by innocent bystanders absent a
strong governmental interest, careful consideration of
alternatives and appropriate measures to reduce the risk of
injury." Id.

In U.S. v. Boulanger, 444 F.3d 76 (1st Cir. 2006), the Court
of Appeals affirmed the district court's denial of the
defendant's motion to suppress evidence based upon his allegation
that the police officers used excessive force when conducting a
search of his apartment.  In Boulanger, the officers knocked down
the door to the defendant's apartment, yelled "police officers"
and "search warrant," and tossed a distraction device into the
apartment.  See id. at 80.  The Court found that the officers
"were confronted with a situation involving a man with a history
of violent crimes, who was a suspect in an armed robbery, was
suspected of selling drugs out of the residence to be searched,
and who likely possessed what an informant who was not an expert
described as a fake gun," and that "the police planned the search
after determining that there were no children or elderly people
in the apartment." Id. at 85.  The Court held that the officers'
decision to use the distraction device was reasonable under the
foregoing circumstances.

In Commonwealth v. Garner, 423 Mass. 735 (1996), the Supreme
Judicial Court of Massachusetts reversed the trial court's grant
of the defendant's motion to suppress evidence obtained during a

search on the grounds that the search was conducted unreasonably. In Garner, the police obtained a no-knock warrant to search the apartment of an armed robbery and rape suspect. The officers possessed information indicating that the two male occupants of the apartment "might be armed with a handgun and sawed off shotgun," "had a sense of the layout of the apartment," and were "aware that, in addition to Garner and another male, a pregnant woman might be present with her two small children." Id. at 736-37. The officers decided to break the window of one of the apartment bedrooms where an adult was believed to be sleeping and toss the device in through the broken window. See id. The officers did so without looking where they threw the device, and a four-year-old child was in fact sleeping in the bedroom. See id.

The Supreme Judicial Court held that the officers' conduct was reasonable under the circumstances. The Court concluded that the police had "strong grounds" to believe that "the occupants of [the apartment] were armed and vicious. Garner, himself, was believed to be armed with a sawed-off shotgun– a particularly lethal weapon when used at close range." Id. at 744. Regarding the officers' decision to throw the device into a room with a sleeping child, the court stated the following:

> [f]aced with the weaponry and dispositions of the
> suspects inside the apartment, we think it parses a
> frightening situation too fine to fault the officer for
> not looking, or if he had looked, for not seeing the

-14-

child after he broke the window and before he threw in
the device. Although the stun grenade may be dangerous,
it is important to recall that it is not intended to
be. It is reusable and intended to frighten and
distract. The judge found that the child sustained
emotional injuries as a result of the assault and was
treated a few days later 'for a health complaint
associated with smoke inhalation.'  The entry in force
would have been frightening even if the device had been
detonated down a hallway. And so, it must be said,
would have been a gun battle in which police officers
or one of the bystanders might have been shot or
killed.

Id. at 744.  The Court concluded that, "[o]nce the decision to
enter was made, the use of the device within the apartment cannot
be described as an unreasonable part of a plan designed to get
the operation over with as quickly as possible and to minimize
the possibility of a gun battle that might have been truly
lethal."  Id. at 745.

        In U.S. v. Meyers, 106 F.3d 936 (10th Cir. 1997), the Court
of Appeals affirmed the district court's denial of a motion to
suppress challenging the manner in which a warrant to search the
defendant's house was executed.  The officers in that case,
through their own observations, had reason to believe that the
defendant was growing marijuana plants.  The officers also
learned that the defendant had "prior convictions for burglary
and theft, and cocaine trafficking.  They also discovered that,
as a juvenile, [the defendant] had been involved in the fire
bombing of a jail or police vehicle and had been convicted of
possession of an unregistered firearm and possession of a fire

bomb." Id. at 938.  The officers obtained a warrant, knocked to announce their presence, waited ten seconds, battered down the door, and rolled a distraction device into the house.  The officers found the defendant, his wife, and three children under the age of ten in the house.

The Court held that the officers' actions were not unreasonable under the circumstances.  Specifically, the court reasoned that

> [t]he use of a "flashbang" device in a house where
> innocent and unsuspecting children sleep gives us great
> pause.  Certainly, we could not countenance the use of
> such a device as a routine matter. . . .  However, we
> also recognize that we must review the agents' actions
> from the perspective of reasonable agents on the scene,
> . . . who are legitimately concerned with not only
> doing their job but with their own safety.  Although it
> might seem that the [officers'] actions in this case
> come dangerously close to a Fourth Amendment violation,
> we cannot say that their actions were objectively
> unreasonable given the district court's factual
> findings.

Id. at 940.

These cases illustrate the foregoing principles.  First, the court should apply the analysis set forth in Graham to claims challenging the use of the distraction device when executing a search warrant.  Second, the objective reasonableness of the officer's decision will be determined by balancing the officer's desire for increased protection with the likelihood that the occupants of the area to be searched, including bystanders, will be harmed.  For example, in Garner, the Court held that the use

-16-

of the distraction device in a bedroom where a four-year-old child, a particularly vulnerable bystander, was sleeping was reasonable because the male suspects in the apartment were armed and suspected of violent behavior.   The Court in <u>Myers</u> also held that the use of a distraction device was reasonable despite the presence of children where one of the adult occupants of the house to be searched had a violent criminal record.

The cases also demonstrate, however, not only that the officers' decision to use the device must be reasonable, but also that the officers must use reasonable caution when actually deploying the device.   For example, in <u>Boyd</u>, the officers tossed the device into a pre-selected location without first looking inside the apartment, and the Court held that, under the circumstances, tossing the device without warning the occupants or looking inside the apartment was unreasonable.   In contrast, the Court in <u>Garner</u> held that the threat of a violent encounter was serious enough to justify using the device without first looking or warning the occupants: "[f]aced with the weaponry and dispositions of the suspects inside the apartment, we think it parses a frightening situation too fine to fault the officer for not looking, or if he had looked, for not seeing the child after he broke the window and before he threw in the device."   <u>Garner</u>, 423 Mass. at 744.

Upon construing the facts most favorably to the plaintiffs,

-17-

plaintiffs may be able to prove that defendants violated their
Fourth Amendment rights.  Smith specifically states in her
affidavit; which is more specific than, but consistent with, her
deposition testimony; that Moriarty (1) looked inside the
apartment; (2) looked at her and Taylor; (3) lobbed the device at
her and Taylor; and (4) struck Taylor with the device.  This
version of the events could lead to one of two reasonable
conclusions: first, Moriarty made a mistake when tossing the
device; or second, Moriarty intended to throw the device at Smith
and Taylor.  A reasonable jury could conclude that, contrary to
Moriarty's statements in his affidavit, he did not throw the
device toward an empty part of the apartment but rather directly
at plaintiffs because, according to Smith, he was looking
directly at plaintiffs when he threw the device, which struck
Taylor.  The court cannot conceive of a set of circumstances that
would permit an officer, contrary to the intended use of the
device, to throw a flash-bang device directly at a person.  In
any event, such circumstances certainly do not exist in this
case, where plaintiffs were unarmed bystanders sitting on a
couch.  Therefore, a jury could conclude that Moriarty and
Ahlquist used unreasonable force against plaintiffs.

     Because plaintiffs' version of defendants' conduct permits
the inference that Moriarty intended to throw the device at
plaintiffs, defendants are not entitled to qualified immunity at

this time.  There is a dispute of fact that, if ultimately
resolved in favor of plaintiffs, would compel the conclusion that
defendants unreasonably violated clearly established law.
Because the device was capable of inflicting serious bodily
injury, defendants had fair notice that they could only use the
flash-bang device when reasonable and that they needed to
exercise caution when actually using the device.  The fact that
binding precedent from the U.S. Supreme Court or the Court of
Appeals for the Second Circuit does not exist on this point is of
no moment; "general statements of the law are not inherently
incapable of giving fair and clear warning, and in other
instances a general constitutional rule already identified in
decisional law may apply with obvious clarity to the specific
conduct in question, even though 'the very action in question has
[not] previously been held unlawful.'"  U.S. v. Lanier, 520 U.S.
259, 271 (1997); see Hope v. Pelzer, 536 U.S. 730, 741 (2002).
Therefore, defendants' motion for summary judgment is denied with
respect to plaintiffs' Fourth Amendment claims against Moriarty
and Ahlquist.

### C. MUNICIPAL LIABILITY

Plaintiffs contend that the City is responsible for the
violation of their Fourth Amendment rights perpetrated by
Moriarty and Ahlquist because the City failed to adequately train
and supervise its officers, and that the City's failure caused

plaintiffs' injuries.  The Supreme Court has held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 694 (1983).  With regard to the claim presented in this case, the Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989).  Thus, according to the Supreme Court, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality– a 'policy' as defined by our prior cases– can a city be liable for such a failure under § 1983." Id. at 389.  Plaintiffs must also "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty America v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting Harris, 489 U.S. at 391).

The City has demonstrated that there is no genuine issue of

-20-

material fact regarding plaintiffs' failure to train claim.  The
City has offered evidence indicating that Moriarty and Ahlquist
received training as mandated by all applicable standards.
Plaintiffs do not point to any specific deficiency, through
expert testimony or any other means, in this training regime that
could have caused the injuries they sustained.  Plaintiffs assert
that there is an issue of fact regarding whether Moriarty
completed a course relating to the use of devices such as the one
used in this case because the City's training report for Moriarty
dated June 30, 2001 does not reflect the fact that Moriarty
completed a training course regarding "OC Aerosol Projectors,
Specialty Impact Munitions, Distraction Devices and Chemical
Munitions" on August 28, 2000.  The City's training report dated
June 30, 2004 does reflect the fact that Moriarty completed this
course.  The overwhelming weight of the evidence, however,
renders this discrepancy immaterial as a matter of law; Moriarty
states in his affidavit that he did take the course, and he has
produced a certificate of completion signed by the training
manager indicating that Moriarty completed the course on or about
August 28, 2000.  The only fact plaintiffs can prove is that the
City did not record Moriarty's receipt of the training as of June
30, 2001, and they cannot refute the fact that he did in fact
receive the training.  Defendants' motion is therefore granted
with respect to Count Fifteen of the Amended Complaint.

D. GOVERNMENTAL IMMUNITY

Defendants assert that they are immune from plaintiffs'
negligence claim under the doctrine of governmental immunity.  In
Connecticut, municipal officials acting in their official
capacity are immune from suit based upon the officer's
performance of a discretionary function.  See Evon v. Andrews,
211 Conn. 501, 505 (1989).  There is no dispute here that
defendants are entitled to assert immunity because their
execution of the search warrant was a discretionary function
performed within the scope of their duties as police officers for
the City of Middletown.  Plaintiffs, however, contend that they
may present their claims to a jury because they can prove that an
exception to governmental immunity applies in this case.
Specifically, plaintiffs argue that "circumstances [made] it
apparent to" defendants that their "failure to act would be
likely to subject an identifiable person to imminent harm. . . ."
Id.

The Connecticut Supreme Court has held that this exception
applies "not only to identifiable individuals but also to
narrowly defined identified classes of foreseeable victims."
Burns v. Bd. of Ed. of the City of Stamford, 228 Conn. 640, 646
(1994).  The Connecticut Supreme Court has listed the following
considerations relevant to determining whether a "narrowly
defined class of foreseeable victims" exists: "the imminency of

-22-

potential harm"; "the likelihood that harm will result from a failure to act with reasonable care"; "the identifiability of the particular victim"; "whether the relationship was of a voluntary nature"; "the seriousness of the injury threatened"; the duration of the threat of injury"; "and whether the persons at risk had the opportunity to protect themselves from harm."  Id. at 647-48.

In this case, plaintiffs were part of a "narrowly defined class of foreseeable victims" subject to imminent harm at the hands of defendants if they failed to act with due care.  It is obvious that the flash-bang device, which is essentially a low-grade explosive device, could cause serious bodily injury to a person within a certain range of the device when it detonates. Further, the use of a flash-bang device is an extraordinary event; the class of persons exposed to harm from the device is limited to those persons found within the area where the device is deployed.  Often, as in this case, officers deploy the device as part of a tactical entry plan, and a person within the target area neither expects to encounter the device nor receives notice that the device is about to be or has been deployed.  The use of a low-grade explosive device to immobilize persons within a certain area by temporarily overwhelming the persons' senses without any warning is inherently dangerous to those against whom the device is employed.  Therefore, plaintiffs were part of a "narrowly defined class of foreseeable victims" subject to

-23-

imminent harm, and defendants' motion for summary judgment must be denied on this ground.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (dkt. # 32) is **GRANTED in part** and **DENIED in part** as follows:

1.   Defendants' motion is **GRANTED** with respect to Count Fifteen of the Amended Complaint, and judgment shall enter in favor of the City of Middletown on Count Fifteen of the Amended Complaint.

2.   Defendants' motion is **DENIED** with respect to Counts Two and Five of the Amended Complaint.

3.   All other Counts set forth in the Amended Complaint are **DISMISSED without prejudice** because plaintiffs have elected not to pursue them.

So ordered this 6th day of June, 2006.

/s/DJS

_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE